IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| JACOLE N. PRINCE, | ) | |
| Petitioner, | ) ) ) | |
| v. | ) ) | No. 4:21-CV-00846-DGK |
| ANNE L. PRECYTHE, | ) ) ) | |
| Respondent. | ) | |

## ORDER DENYING HABEAS PETITION

This habeas case stems from Petitioner Jacole Prince's ("Petitioner") state court conviction for first-degree assault, felony abuse of a child, and first-degree endangering the welfare of a child. Now before the Court is her fully briefed Petition Under 28 U.S.C. § 2254 for Writ of Habeas Corpus. ECF No. 1. For the following reasons, the Petition is DENIED.

## BACKGROUND

On a petition for a writ of habeas corpus brought by a person in state custody, a federal court views the facts and evidence in the light most favorable to the state court's verdict. *Hendricks v. Lock*, 238 F.3d 985, 986 (8th Cir. 2001); *see also* 28 U.S.C. § 2254(e)(1) (2009). The following summary of the evidence and procedural history of Petitioner's case draws heavily from the Missouri Court of Appeals decision denying Petitioner's direct appeal. *State v. Prince*, 518 S.W.3d 847, 849-52 (Mo. Ct. App. 2017).

In October 2005, Petitioner's then four-year-old daughter L.P. was admitted to Children's Mercy Hospital in Kansas City. She was unresponsive from an unknown cause and was unable to breath effectively on her own. She was placed in the intensive care unit and underwent surgery, after which she was temporarily placed on a respirator. Measurements of her weight and length found her to be below the standard for her age. When she was first admitted, she weighed only

11.9 kilograms (26.2 pounds). When she was discharged, her weight had actually increased, despite being on a respirator and thus unable to eat for part of her stay.

L.P. was readmitted to the hospital on January 31, 2006. She had lost significant weight since her previous discharge. Despite being four-years-old, her weight was that of a two-year-old. L.P. also showed signs of developmental delays, including regressing from being properly toilet trained. Despite being in the hospital for only two days, L.P. gained a kilogram of body weight, which was unusual given that average weight gain for a child of her age was only six to seven grams per day. Healthcare providers determined that L.P. suffered from acute and chronic malnutrition. They believed it the result of neglect including the intentional withholding of food. They also noted that Petitioner had failed to follow the medical plan outlined for L.P. upon her previous discharge, including missing two scheduled clinic appointments.

During L.P.'s second hospital admission, Petitioner confessed to medical staff that she had intentionally withheld food from L.P. as a form of punishment for perceived potty training failures. In response to Petitioner's admissions and their own observations, healthcare providers made a hotline call to report the suspected abuse and neglect of L.P. The State of Missouri removed L.P. and her sister from Petitioner's custody and placed them in the care of Petitioner's boyfriend, who was the biological father of one of Petitioner's other children.

L.P. showed significant signs of improvement after being removed from Petitioner's custody. Her potty training issues stabilized, and she began attending kindergarten. Her condition continued to improve through May of 2006, at which point she was released from treatment for growth problems related to malnourishment. At the time, she weighed 14.9 kilograms (32.8 pounds).

The State returned L.P. to Petitioner's custody in April of 2007. Shortly afterwards, L.P. stopped attending school and was instead forced to spend most of each day locked in an upstairs

bedroom closet in Petitioner's apartment. L.P. regularly went to the bathroom in the closet and slept in the closet at night. She would sometimes be fed in the closet and was at other times allowed to join the family for meals, though in such instances she ate her meal behind the couch while the rest of the family sat on the couch and watched television. L.P. was usually allowed to eat once per day, but some days she went without any food. On some occasions, Petitioner would take L.P.'s food away as a form of punishment. When family members who knew of L.P.'s existence visited Petitioner's apartment, Petitioner would clean her and allow her out of the closet to play. If Petitioner entertained visitors who did not know about L.P., however, she would lock her in the closet and tell her to be quiet. L.P. testified that being kept in the closet was used as punishment for urinating or defecating on herself.

While in the closet, L.P. was supposed to indicate when she needed to use the restroom by banging on the door. When she needed to relieve herself but no one opened the closet door, because either no one was able to hear her or Petitioner chose to ignore her, L.P. would be forced to urinate or defecate on herself.

On June 22, 2012, the Children's Division received a hotline call reporting that L.P. was being kept in a locked closet in Petitioner's apartment and was not being properly fed. The Children's Division designated the call as an emergency and assigned an investigator to examine its authenticity.

The investigator reviewed the Children's Division's records regarding Petitioner and L.P. and attempted, but failed, to make contact with the hotline caller. The investigator then contacted law enforcement and arranged to have them meet her at Petitioner's apartment. Once the investigator arrived at Petitioner's apartment, she informed the police of the information in the Children's Division's records and then knocked on the door but did not get a response. The police and the investigator prepared to leave, with the intention of returning later, but were stopped by

Petitioner's neighbors. The neighbors informed the police that Petitioner had left a short time earlier with her "two children," by which the police understood the neighbors to mean Petitioner's other two daughters. When questioned regarding Petitioner's eldest daughter, L.P., the neighbors denied knowledge of a third child but speculated that, if there was a third child, she resided with a family member or friend. This corroborated information from the hotline call that Petitioner regularly told other family members or friends that L.P. lived with an aunt. The police contacted the head of the Housing Authority's Public Safety Department who confirmed that three children were supposed to be residing in the apartment according to their records. Based on this information, the police decided to enter the apartment.

Once inside the apartment, officers found their way to a bedroom on the second floor, which was described as emanating a strong odor of urine. The officers observed that the closet door had been tied shut and a large playpen had been pushed in front of it. One of the officers knocked on the closet door and asked if anyone was inside. L.P. responded, "I am." The officers quickly opened the closet and removed L.P. who was transported to Children's Mercy Hospital.

When admitted at the hospital, L.P. weighed approximately 32 pounds, nearly the same weight as six years earlier. She was suffering from bradycardia (low heart rate), lacked subcutaneous fat, had very poor muscle tone, and showed signs of bruising or swelling on her lower back.

Meanwhile, Petitioner, having been informed by a neighbor that the police were interested in speaking with her, fled to her boyfriend's sister's residence. Police eventually tracked her down, and she was taken into custody. When interviewed by police, Petitioner initially denied keeping L.P. in the closet before admitting that she would occasionally lock L.P. in the closet when she left the apartment. Petitioner told police that she did not want others realizing how poorly L.P. was

being cared for and feared that her other daughters would be taken away. Several times during the interview, Petitioner admitted that she had treated L.P. "terribly wrong."

Petitioner was charged with one count of assault in the first degree (Count I), one count of abuse of a child (Count II), and one count of endangering the welfare of a child (Count III).

On January 7, 2014, Petitioner appeared before the plea court to enter *Alford* pleas to Counts I and II and a conventional guilty plea as to Count III. In exchange, the State agreed to cap Petitioner's sentence at twenty years. When the plea court asked Petitioner if she wished to plead guilty, she initially responded "no." After a fifteen-minute recess, during which she met with her attorney, she changed her position and agreed to plead guilty in accordance with the agreement. After conducting a plea hearing and making the necessary findings, the plea court accepted the guilty pleas and scheduled sentencing for April 25, 2014.

Ten days later, Petitioner sent a postcard to the plea court claiming her pleas had been the product of coercion by her counsel. She also sent a forty-two page letter to the Kansas City Star in which she repeated the claims made in the postcard sent to the plea court. On February 10, 2014, the plea court entered an order setting aside the pleas, placed the case back on the trial docket, and transferred the case to a different division.

With the pleas set aside, the case went forward on the original charges before a new trial judge. Prior to trial, Petitioner filed a motion to suppress all evidence related to the discovery of L.P., all medical evidence that followed the discovery of L.P., and all other evidence seized from her apartment, arguing the evidence was the product of an unlawful entry into her apartment. The trial court denied the motion. The matter proceeded to trial before a jury beginning on November 20, 2015.

5

Case 4:21-cv-00846-DGK   Document 12   Filed 12/07/22   Page 5 of 11

During the trial, Petitioner called two witnesses, one to challenge certain aspects of L.P.'s injuries and one to support a diminished capacity defense. Petitioner did not object to the introduction of the evidence seized from her apartment.

Petitioner was found guilty of all three counts. The jury recommended sentences of twenty years as to Count I and seven years as to both Counts II and III. The trial court sentenced Petitioner consistent with the jury's recommendations, running the sentences consecutively for a total of thirty-four years' imprisonment.

Petitioner raised three claims on direct appeal: (1) the plea court erred in vacating her plea; (2) the trial court erred in overruling her motion to suppress evidence found in a warrantless search of her apartment; and (3) the trial court erred in overruling her motion for a mistrial that she made after her own outbursts during the sentencing phase. The appeals courts reviewed Petitioner's first claim for plain error after noting that she did not complain about her pleas being set aside at any time before or during trial, but only after being found guilty. The appeals court found the plea court did not commit plain error in treating Petitioner's postcard as a request to withdraw her plea and in granting this request because Petitioners allegations went directly to a material aspect of her plea, namely that it was not voluntary. Reviewing the trial court's ruling denying the motion to suppress for plain error since Petitioner did not object to admission of this evidence at trial, the appeals court held exigent circumstances existed to enter the apartment because substantial evidence showed a child was in the apartment and suffering abusive neglect. Finally, the appeals court found the trial court did not abuse its discretion in denying a mistrial, holding Petitioner sought a mistrial based on her own misconduct that was not unavoidable or the intended result of action by the State or a State witness, and the trial court remedied the situation with jury instructions.

In her state post-conviction motion to the trial court, Petitioner made three arguments. Trial counsel was ineffective for (1) failing to withdraw due to a conflict of interest after Petitioner alleged counsel had coerced her into pleading guilty, and (2) for not objecting to withdrawal of the plea without the guidance of conflict-free counsel. Also (3) trial counsel was ineffective for not objecting to the withdrawal of the plea without conflict-free counsel, and direct appeal counsel was ineffective for not raising the issue of the plea being withdrawn without conflict-free counsel.

The trial court rejected each claim, holding respectively (1) trial counsel was not required to withdraw; (2) trial counsel was not acting under a conflict; and (3) there was no conflict by trial counsel and to claim that there was on appeal would have been frivolous.

Petitioner reiterated these claims in her post-conviction appeal, with the exception of the third claim, which the Missouri Court of Appeals found was slightly different than that presented to the motion court. The Missouri Court of Appeals affirmed the trial court's decision denying post-conviction relief.

## STANDARD OF REVIEW

Federal courts may not grant a writ of habeas corpus on any claim that was adjudicated on the merits in a state court proceeding unless adjudication of the claim,

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2).

A decision is contrary to clearly established Supreme Court law if the "state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or . . . decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts."

*Williams v. Taylor,* 529 U.S. 362, 412-13 (2000). A decision unreasonably applies clearly established Supreme Court law "if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* This standard is objective, not subjective. *Id.* at 409. An unreasonable application of federal law is different from an incorrect application of federal law. *Id.* at 410.

As for the "decision based on an unreasonable determination of the facts" prong of the analysis, a factual finding made by a state court is presumed correct. 28 U.S.C. § 2254(e). The petitioner bears the burden of rebutting this presumption by clear and convincing evidence. *Id.*

## DISCUSSION

Petitioner brings three claims for relief: (1) her right to due process was denied when the plea court vacated her *Alford* plea and she was subsequently tried, resulting in being placed in double jeopardy in violation of the Fifth and Fourteenth Amendments; (2) her Fourth and Fourteenth Amendment right to freedom from unreasonable search and seizure was violated when the trial court overruled her motion to suppress evidence obtained as a result of the police officers' warrantless entry into her apartment; and (3) she was denied the right to effective assistance of counsel under the Sixth and Fourteenth Amendments when her trial counsel failed to withdraw due to a conflict of interest after Petitioner alleged her *Alford* plea was coerced by plea counsel.

**I.     The Court cannot grant the Petition because Petitioner's claims are not reviewable.**

After carefully reviewing the Petition, the Court concludes an evidentiary hearing is not necessary to rule on the Petition because each of Petitioner's claims is procedurally barred.

Petitioner's double jeopardy claim is procedurally barred from review because, as noted above, it was not preserved at trial and then was rejected on appeal under a plain error analysis. A federal court may not review an issue that was not raised at trial but was subsequently reviewed by a state appellate court for plain error. *Clark v. Bertsch*, 780 F.3d 870, 874 (8th Cir. 2015).

8

Case 4:21-cv-00846-DGK   Document 12   Filed 12/07/22   Page 8 of 11

Petitioner's Fourth Amendment claim is also procedurally barred because Petitioner did not object during trial to admission of the evidence from the officers' warrantless search during trial and then the Missouri Court of Appeals rejected her claim under a plain error analysis. *Id*. Alternately, this claim is not reviewable because the state court provided Petitioner with a full and fair opportunity to litigate her Fourth Amendment claim, thus the Supreme Court's decision in *Stone v Powell* bars federal habeas review. *Chavez v. Weber*, 497 F.3d 796, 802 (8th Cir. 2007).

Petitioner's ineffective assistance of counsel claim is procedurally barred from federal habeas review because it was defaulted in state court under a state procedural rule, namely, the claim she presented to the appellate court in her post-conviction appeal varied from the claim she presented to the motion court on her post-conviction appeal. As the post-conviction appellate court explained,

> Ms. Prince contends that the motion court clearly erred in ruling that plea counsel was not ineffective "for failing to object to the [plea] court withdrawing Ms. Prince's guilty plea without giving her the benefit of conflict-free counsel." She argues that a defendant is entitled to conflict-free counsel during critical stages of a criminal case, and plea counsel had a conflict of interest once she filed a motion to withdraw the guilty plea and alleged that he had "acted improperly by coercing her to accept the initial plea offer." Ms. Prince argues, "Had it been explained to her by a conflict-free attorney before the judge took her missives as requests to withdraw her plea, Ms. Prince would have maintained the *Alford* pleas in counts I and II and the conventional plea to count III in exchange for the State's offered lid of twenty years in the Department of Corrections." The motion court rejected this claim without discussion, simply referring to its determination that plea counsel was not acting under an actual conflict of interest at any time during his representation of Ms. Prince, and, because she premised this claim on counsel's conflict of interest, "it must likewise fail."
>
> Ms. Prince's framing of the issue on appeal appears to this Court to suggest that counsel should have objected to the plea court *before* it entered the order that she lacked conflict-

> free counsel and thus the court could not order her pleas withdrawn until she had such counsel. **This is not precisely how she raised and argued the point in the amended Rule 29.15 motion**. She repeatedly stated that plea counsel was ineffective for failing to object *when* the court set aside her guilty plea without affording her the benefit of conflict-free counsel. **As we stated above, an ineffectiveness claim not presented to the plea court cannot be appealed and cannot be considered on appeal as a matter of plain error**. As well, Ms. Prince has not explained how counsel could have objected to an order before it issued or after it was issued outside the presence of counsel. This point is denied.

*Prince v. State of Missouri*, WD82121, at 14-15 (Mo. Ct. App. Dec. 15, 2020) (memorandum order affirming denial of post-conviction relief) (bold emphasis added); ECF No. 6-22. Presenting a slightly different claim violates a Missouri procedural rule which requires the identical claim be presented "at each step of the judicial process in order to avoid default." *Arnold v. Dormire*, 675 F.3d 1082, 1087 (8th Cir. 2012). And a federal court cannot review a claim that has been defaulted in state court because of a state procedural rule. *Id*. at 1086-87.

**II.    A certificate of appealability should not be issued on any of Petitioner's claims.**

Finally, the Court declines to issue a certificate of appealability on any of Petitioner's claims. To issue a certificate of appealability a district court must find that the petitioner has made a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2); *Tiedman*, 122 F.3d at 521. This requires the petitioner to "show that reasonable jurists could debate whether . . . the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003) (quotation omitted).

After reviewing all the issues raised in the Petition, the Court holds Petitioner has failed to make a substantial showing of the denial of a constitutional right on any of these claims. Reasonable jurists could not debate that the Petition should have been resolved differently.

**Conclusion**

For the reasons discussed above, the Petition Under 28 U.S.C. § 2254 for Writ of Habeas Corpus is DENIED and a certificate of appealability is not issued.

**IT IS SO ORDERED.**

Date: __December 7, 2022__          /s/ Greg Kays
                                    GREG KAYS, JUDGE
                                    UNITED STATES DISTRICT COURT